1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

8   KAMARIO SMITH,

9        *Petitioner*,                                    2:14-cv-01021-GMN-NJK

10
11  vs.                                                   ORDER

12  RENEE BAKER, *et al.,*

13        *Respondents*.

14

15        This habeas matter under 28 U.S.C. § 2254 by a Nevada state inmate comes before

16  the Court for a final decision on the merits.

17                                   ***Background***

18        Petitioner Kamario Smith challenges his 2012 Nevada state conviction, pursuant to a

19  jury verdict, of conspiracy to commit robbery, robbery with the use of a deadly weapon, and

20  possession of a firearm by an ex-felon.  He challenged the conviction in the state courts on

21  direct appeal and post-conviction review.

22        On federal habeas review, petitioner challenges, *inter alia*, the sufficiency of the

23  evidence supporting his conviction.  The evidence presented at trial included, *inter alia*, the

24  following.[1]

25  _____

26        [1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of
    evidence or statements of fact in the state court.  The Court summarizes same solely as background to the
27  issues presented in this case, and it does not summarize all such material.  No statement of fact made in
    describing statements, testimony or other evidence in the state court constitutes a finding by this Court.  Any
28                                                                                    (continued...)

Melissa Applewhite testified as follows at trial.  At around 7:00 p.m. on April 17, 2011, Applewhite was at Bells Market on West Owens Avenue in Las Vegas.  While there, she saw an individual exiting a white Cadillac with a brown or red top; and she identified the individual that she saw at Bells Market as the defendant, Kamario Smith.  She did not know Smith, but she had seen him "a couple" of times in the area and had rebuffed his advances seeking her phone number.  She also had seen him another time when he was at the house of a boyfriend of hers.  (ECF No. 10-13, at 10-14, 38-39 & 83-84; Exhibit 13, at 9-12, 37-38, & 82-83.)[2]

Applewhite called Smith over and asked him whether he knew anyone that could sell her some Roxicets, a prescription medication.[3]  He said that he knew someone who could help her get the Roxicets, and he ultimately gave her a phone number on a piece of paper.  (ECF No. 10-13, at 14-18, 64-65 & 135-37; Exhibit 13, at 13-17, 63-64 & 134-36.)

When she called the number, a male told her that he could not come to where she was and that she instead would have to drive to an XO Liquor store on East Charleston at Highway 95.  (ECF No. 10-13, at 21-23; Exhibit 13, at 9-12.)

During the drive over, she also received a call from a different number in which the caller told her to follow through with the meeting at the XO Liquor store.  (ECF No. 10-13, at 28; Exhibit 13, at 27.)

Once at the XO Liquor store, Applewhite wanted to do the transaction at that location, which was monitored by a security camera.  However, when she called the number again, the male told her to instead drive back into the Santa Fe Apartment complex that was behind the

_____

[1](...continued)
absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering petitioner's claims.

[2]While the business is referred to as Bell's Market in the rough transcript, the actual name of the local Las Vegas business is Bells Market.

In the transcript, Applewhite refers to the Cadillac as having a "wrack top," perhaps referring to a "ragtop" or convertible.  See also ECF No. 11-2, at 85; Exhibit 15, at 84 (referring to "rag top").

[3]Roxicet is a trade name for a combination of oxycodone and paracetamol, which also is marketed under the trade name Percocet.  https://en.wikipedia.org/wiki/Oxycodone/paracetamol

liquor store.  She put her purse in the trunk.  She then drove back into the complex, where a black male directed her to park near a brick wall.  (ECF No. 10-13, at 23-26, 28-29, 42-43, 68-70, 72-76 & 80-81; Exhibit 13, at 22-25, 27-28, 41-42, 67-69, 71-75 & 79-80.)

As she parked, the man got in the car and sat in the passenger seat.  Applewhite had approximately $200.00 in her hand and another $200.00 in her bra.  The man asked her how many Roxicets she wanted to buy, and she told him.  She gave him the $200.00 in her hand.  (ECF No. 10-13, at 26-27, 29-30 & 130-31; Exhibit 13, at 25-26, 28-29 & 129-30.)

At this point, Smith came up to the driver's side of her car, put a black semiautomatic pistol to Applewhite's neck through the half open driver's side window, and told her to give him everything.  She said that she had given the money to the other man.  Smith saw the money in her bra through her see-through blouse, however, and made her give him that money as well.  He then pulled her blouse lower to make sure that she had no other money in her bra.  The other man, meanwhile, was rummaging through the interior of her car while Smith held the gun to her neck, apparently looking for additional items to steal.  (ECF No. 10-13, at 30-33; Exhibit 13, at 29-32.)

Smith pulled the slide back on the pistol, telling Applewhite not to play with him.  He said "give me your money, bitch . . . Imma shoot this bitch . . . Imma shoot this bitch."  It reached a point where the other man asked Smith "are you really going to do this" and pulled up his t-shirt to cover his face from the aftereffects of the anticipated gunshot.  (ECF No. 10-13, at 32-33; Exhibit 13, at 31-32.)

Applewhite told Smith that she had given them everything.  Smith asked about her purse, and she said that did not have one.  Smith continued saying that Applewhite was playing with him.  Her cell phone started to ring, and Smith made her give him her phone.  (ECF No. 10-13, at 33-34 & 131-34; Exhibit 13, at 32-33 & 130-33.)

Smith then made Applewhite give him her car keys.  As Smith fumbled with the key fob in an effort to open the trunk, he hit the wrong button and activated the car alarm.  Smith dropped the keys, and both Smith and the other man ran off in the same direction.  (ECF No. 10-13, at 34-35; Exhibit 13, at 33-34.)

1    Applewhite collected herself and then recovered her keys from off the ground.  She

2  drove back around to the liquor store and retrieved her purse from the trunk.  She then went

3  across the side street to a gas station and called 911.  (ECF No. 10-13, at 35-38, 43, 65-66,

4  70-72 & 76-80; Exhibit 13, at 34-37, 42, 64-65, 69-71 & 75-79.)

5    Applewhite thereafter related to both the 911 dispatch officer and the responding

6  officers what had happened.  However, she did not tell the police that she had been there to

7  buy Roxicets.  Applewhite instead said that she had been on her way to see a friend living in

8  the Santa Fe apartments when she was robbed in the parking area.  She also stated that she

9  had seen Smith's Cadillac at the robbery scene, which she had not.  Applewhite further

10  referred at one point in her statement to the handgun being a revolver.  However, she also

11  stated that the handgun had a slide, which a revolver does not have; and she said the

12  handgun was like the officer's handgun, which was a semiautomatic pistol rather than a

13  revolver.  (ECF No. 10-13, at 43-45, 80-91 & 120-29; Exhibit 13, at 42-44, 79-90 & 119-28.

14  ECF No. 11-2, at 45-76 & 80-85; Exhibit 15, at 44-75 & 79-84.)

15    Three days later, after a detective challenged her account of the incident, Applewhite

16  admitted that she had not been entirely truthful with police; and she told the investigating

17  detectives that she had been at the scene to buy Roxicets.  (ECF No. 10-13, at 52-53 & 126-

18  29; Exhibit 13, at 51-52 & 125-28.  ECF No. 11-2, at 101-05 & 120-24; Exhibit 15, at 100-04

19  & 119-23.  ECF No. 11-4, at 98-100 & 124-45; Exhibit 17, at 97-99 & 123-44.)

20    At that same time, Applewhite positively identified Smith as the robber with the gun

21  from a six-person photographic lineup.  She stated at the time that she was "a thousand

22  percent sure" as to her identification of Smith.  She also referenced the tattoos on Smith's

23  arms during her initial 911 call.  She later was not able to identify any additional person from

24  a second photographic lineup as Smith's accomplice.  (ECF No. 10-13, at 39-40, 53-57 & 60-

25  62; Exhibit 13, at 38-39, 52-56 & 59-61.  ECF No. 11-2, at 105-10 & 146-51; Exhibit 15, at

26  104-09 & 145-50.  ECF No. 11-4, at 97; Exhibit 17, at 96.)

27    The surveillance video from the Bells Market showed Smith driving up in the white

28  Cadillac with the red top and exiting the vehicle, Smith being motioned over by Applewhite

and talking to her, and Applewhite later going to Smith's car at the point that she said that he handed her the paper with the number on it. (ECF No. 10-13, at 18-21; Exhibit 13, at 17-20. ECF No. 11-2, at 86-87 & 90-92; Exhibit 15, at 85-86 & 89-91.)

Smith drove a white Cadillac with a brown or red top, which was owned by his mother. (ECF No. 11-2, at 85-89 & 92-93; Exhibit 15, at 84-88 & 91-92. ECF No. 11-4, at 23-28, 33-38, 40-65 & 114; Exhibit 17, at 22-27, 32-37, 39-64 & 113.)

The surveillance video from the XO Liquor store initially showed Applewhite driving up to the store the first time, speaking on her cell phone, putting an item in her trunk, and then driving toward the Santa Fe Apartments. The video further showed Applewhite returning to the store parking lot in her vehicle about six minutes later, retrieving something from the trunk, and then driving over to the Chevron gas station, briefly going inside the Chevron, and then making a call from the pay phone outside the Chevron. (ECF No. 11-2, at 89-90 & 93-101; Exhibit 15, at 88-89 & 92-100.)

Telephone call records showed Applewhite's calls to the number that Smith gave her and also intervening calls to Applewhite's phone from the number for a Blackberry cell phone that was in Smith's hand when he later was stopped by police in the Cadillac. Forensic examination of the Blackberry also reflected calls from the Blackberry to Applewhite's phone and further to the number that Smith gave her for the drug buy. (ECF No. 10-13, at 46-52; Exhibit 13, at 45-51. ECF No. 11-2, at 13-16; Exhibit 15, at 12-15. ECF No. 11-4, at 49, 77-92 &100-03; Exhibit 17, at 48, 76-91 & 99-102.)

Applewhite's cell phone was recovered during the execution of a search warrant at the residence of a girlfriend of Smith's with whom he occasionally stayed. Applewhite identified the phone as her phone. Examination by a technician with the carrier confirmed that the phone was Applewhite's phone, both by her photographs and other identifying content on the phone as well as by its serial and cellular numbers. (ECF No. 10-13, at 57-60; Exhibit 13, at 56-59. ECF No. 11-2, at 22-33, 128-30, 135-42 & 156-60; Exhibit 15, at 21-32, 127-29, 134-41 & 155-59. ECF No. 11-4, at 74-75, 110-11 & 119-21; Exhibit 17, at 73-74, 109-10 & 118-20.)

A fingerprint and a palm print matching Smith were recovered from the exterior of Applewhite's car. She testified that he had not touched her car when they were at the Bells Market. She told the police during the investigation that she had observed him touching her vehicle during the robbery. (ECF No. 10-13, at 40-41, 45 & 63; Exhibit 13, at 39-40, 44 & 62. ECF No. 11-4, at 146-88; Exhibit 17, at 145-87.)

When Smith was taken into custody, he stated to the police after having been advised of his rights that he had been at the Bells Market on April 17, 2011, and that he had given Applewhite a number on a piece of paper when she asked about buying some Roxicets. He denied having any contact with her, or making any calls to her, after that point. He later continued to deny that he had called Applewhite or that he even had her number when the police told him that forensic evidence showed that calls had been placed to her number from his Blackberry. (ECF No. 11-4, at 107-18; Exhibit 17, at 106-17.)

No firearm was found by the police in any search. (E.g., ECF No. 11-2, at 160-61; Exhibit 15, at 159-60.)

### Standard of Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. 563 U.S. at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 563 U.S. at 181-88.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme

Court decision and nevertheless arrives at a different result. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 569.

-7-

***Discussion***

***Ground A: Victim's Testimony and Sufficiency of the Evidence***

In Ground A, petitioner alleges that he was denied a right to a fair trial in violation of the Sixth Amendment because the trial court allegedly abused its discretion in allowing Melissa Applewhite's testimony because her testimony was more prejudicial than probative. Petitioner asserts that Applewhite's testimony was not believable because: (1) she admitted that she lied initially to the 911 dispatcher and investigating officers; (2) she had a substance abuse problem; (3) she was seeking to purchase illegal drugs; and (4) her testimony was riddled with logical inconsistencies, such as alleged testimony that she went from the XO Liquor store to the Chevron to call 911 because they had a phone booth, but, once there, she went inside to ask to use their phone. Smith further urges that Applewhite should not have been allowed to testify about the use of a handgun in the robbery because no gun was recovered. Smith contends that Applewhite's testimony therefore was inadmissible under N.R.S. 48.035(1) because the probative value of her testimony was substantially outweighed by a danger of unfair prejudice. Finally, Smith maintains that there was insufficient evidence to support the conviction because Applewhite's allegedly problematic testimony was the only evidence supporting the charges and she could not identify the alleged co-conspirator. (ECF No. 1, at 5-6.)

The Supreme Court of Nevada rejected the corresponding claims presented to that court on the following grounds:

> . . . Smith contends that insufficient evidence supports his convictions because the victim's testimony was incredible due to false statements she made to the police, inconsistencies in her description of the firearm and other statements to the police, and the fact that a gun was never located. The evidence shows that the victim drove to a market in Las Vegas and spoke to Smith about purchasing Roxicet (prescription pain pills). Smith gave the victim a slip of paper with a telephone number on it. When the victim called the number, a man told her to drive to a liquor store. When she arrived, an unknown man directed her where to park—behind the liquor store in a dark alley. The man got in the passenger side of the victim's car and asked her how many pills she wanted to purchase. About that time, Smith approached the driver's side window and put a gun to the victim's neck,

demanded money, and threatened to shoot her. Meanwhile, the other man rifled through the glove compartment and console of the victim's car. The victim handed over $400 to Smith. When the victim's cell phone rang, Smith demanded her phone and car keys. While attempting to open the car's trunk, Smith accidentally activated the alarm. Smith and the other man fled. The victim left the area and drove to a nearby gas station to call the police. During the investigation, the police retrieved the victim's cell phone from Smith's residence and discovered his fingerprints on the victim's car. Viewing the evidence in the light most favorable to the State, we conclude it is sufficient to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992); *see also* NRS 193.165; NRS 199.480; NRS 200.380; NRS 202.360. As to the false statements and inconsistencies in the victim's statements to the police, those matters were explored during her testimony and therefore were before the jury for its consideration. *See Washington v. State*, 112 Nev. 1067, 1073, 922 P.2d 547, 551 (1996) (providing that "where there is conflicting testimony presented at trial, it is within the province of the jury to determine the weight and credibility of the testimony"); *McNair*, 108 Nev. at 56, 825 P.2d at 573 ("[I]t is the jury's function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses."). Further, the jury was also aware that no gun was recovered during the investigation.[FN1]

> [FN1] Smith argues that the district court abused its discretion by allowing the victim to testify because her testimony was incredible and therefore more prejudicial than probative and no weapon was found. Because he did not object to this testimony, his claim is reviewed for plain error affecting his substantial rights. *Mclellan v. State*, 124 Nev. 263, 267, 182 P.3d 106, 109 (2008). Credibility matters associated with the victim's testimony and the prosecution's inability to produce the weapon allegedly used in the robbery go to the weight of the evidence not admissibility. *McNair*, 108 Nev. at 56, 825 P.2d at 573. We conclude that Smith has failed to demonstrate plain error.

(ECF No. 12-19, at 2-4; Exhibit 38, at 1-3.)

At the very outset, Ground A as alleged in federal court in large part presents a state law claim of evidentiary error that clearly is not cognizable on federal habeas review. Smith argues at length that Applewhite's testimony should have been excluded under state statutory and case law. Such a claim of error under Nevada state law simply is not cognizable in a federal habeas proceeding. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The state supreme court's holding under Nevada state law is the final word on that matter.

To the further extent that Smith alleges that the admission of Applewhite's testimony violated his Sixth Amendment right to a fair trial, the state supreme court's implicit rejection of the federal constitutional claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. There are no Supreme Court precedents holding that a victim's testimony must be excluded because she initially lied to the police about a drug buy that turned into a robbery, she was addicted to painkillers, there were alleged inconsistencies in her testimony, the gun to which she testified was not found, and/or she failed to identify an accomplice. In short, there is no federal constitutional requirement that a complaining witness must be beyond all possible reproach with no alleged inconsistencies in her testimony and/or that an armed robber can be convicted based on the complaining witness' testimony only if the gun is found and his accomplice is identified. The state supreme court's rejection of this patently meritless claim was neither contrary to nor an unreasonable application of clearly established federal law, and the claim further would not provide a basis for relief even on a *de novo* review.

To the further extent that Smith alleges that the evidence was insufficient to sustain the conviction, the state supreme court's explicit rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

On a challenge to the sufficiency of the evidence, the habeas petitioner faces a "considerable hurdle." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003). Under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979), the jury's verdict must stand if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *E.g., Davis*, 333 F.3d at 992. Accordingly, the reviewing court, when faced with a record of historical facts that supports conflicting inferences, must presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution, even if the resolution by the state court trier of fact of specific conflicts does not affirmatively appear in the record. *Id.* The *Jackson* standard is applied with reference to the substantive elements of the criminal offense as defined by state law. *E.g., Davis*, 333 F.3d at 992. When the

-10-

deferential standards of AEDPA and *Jackson* are applied together, the question for decision on federal habeas review thus becomes one of whether the state supreme court's decision unreasonably applied the *Jackson* standard to the evidence at trial. *See, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

Given the evidence summarized herein,[4] the Supreme Court of Nevada clearly reasonably applied the *Jackson* standard to the evidence at trial. Smith's underlying assumption that he could not be convicted of the offenses unless a gun was found and his accomplice was identified is not supported by any apposite Supreme Court precedent. The evidence presented at trial, including Applewhite's testimony, allowed a permissible inference by the jury that Smith conspired with the unidentified accomplice to rob Applewhite rather than sell her painkillers and that Smith used a gun pressed to Applewhite's neck during the ensuing robbery. A conspirator is not absolved of culpability merely because his coconspirator evades identification and arrest. Nor can an armed robber avoid culpability by the simple expedient of getting rid of his weapon.[5]

Smith's further underlying assumption that Applewhite's testimony was not admissible under the Sixth Amendment is not supported by any apposite Supreme Court precedent, as discussed above. However, even if her testimony had been admitted in error, the *Jackson* analysis nonetheless must be applied to all of the evidence actually admitted by the trial court, regardless of whether the evidence was admitted erroneously. *McDaniel v. Brown*, 558 U.S. 120, 131 (2010). Thus, even if Smith's argument as to the admissibility of Applewhite's testimony had merit – which it does not – his argument still would not lead to a conclusion that the evidence at his trial was insufficient under *Jackson*.

Ground A therefore does not provide a basis for federal habeas relief.

/ / / /

---

[4]See text, *supra*, at 2-6.

[5]*Cf.* ECF 12-1, at 21; Exhibit 20, Instruction No. 19: "The State is not required to have recovered the deadly weapon used in an alleged crime, or to produce the deadly weapon in court at trial, to establish that a deadly weapon was used in the commission of the crime."

-11-

***Ground B: Alleged Prosecutorial Comment on Failure to Testify***

In Ground B, petitioner alleges that the State improperly commented during closing argument on his failure to testify, in violation of, *inter alia*, the Fifth Amendment.

During the defense closing, defense counsel Kalani Hoo suggested that Melissa Applewhite's account of the robbery[6] was fabricated and further was uncorroborated by any surveillance video or other evidence from the time of the actual alleged robbery. In this vein, counsel argued in particular as follows with regard to the fact that Applewhite's cell phone was found at Smith's girlfriend's residence:

> We no [sic] what we saw on the video. We know that she whisked away prior versions or some versions of what she's believed to have said. We don't know how that phone was in that house. We don't know if it was traded. We don't know if it was given. We don't – we just don't know. And if we don't know, State has failed to meet its burden.

(ECF No. 11-6, at 42-43; Exhibit 19, at 41-42.)

In the State's rebuttal, the prosecutor challenged defense counsel's implication that Applewhite would have fabricated a robbery report after consummating a drug buy in which she used her cell phone as payment or partial payment:

> . . . . So when Mr. Hoo asked you oh, we have no idea how the phone go [sic] to the defendant's house, we have absolutely every idea, right?
>
> . . . . .
>
> When Mr. Hoo asked about well, we don't really know how he [sic] got there. We don't know if it was traded. What evidence of trading was presented to you? . . . .
>
> . . . . .
>
> But you can look at motive or lack of motive as to why somebody would either commit a crime, in the defendant's case, or why in this case, why would she make this up? You assess the credibility and believability. Did Melissa Applewhite strike you as a person that had some sophisticated plan available to manufacture against defendant? Why? Why?

---

[6] See text, *supra*, at 2-4, within the summary of the trial evidence.

-12-

He can't explain away why he has his cell phone – her cell phone because it doesn't make sense that he would have it in some sort of trade. If she actually – I mean, let's think about this. What defense is asking you to – to jump to or infer.

Melissa Applewhite called to get these drugs and we know from the defendant that he was going to provide them to her. And she met him. And she got the drugs. And she traded the cell phone and money for the drugs. Why would she call police again? A drug addicted person, a person who is addicted to drugs want [sic] to lock up their supplier because why? That makes no sense.

Why would she ever call the police out to take away the man that could supply her with the thing that she's been keeping a secret from her family from and the thing that is what she wants to get on the streets when she can't get a prescription. That makes no sense whatsoever.

(ECF No. 11-6, at 44, 45 & 49-50; Exhibit 19, at 43, 44 & 48-49.)

In Ground B, petitioner alleges that the prosecutor commented on his failure to testify when he stated: "He can't explain away why he has his cell phone – her cell phone because it doesn't make sense that he would have it in some sort of trade." (ECF No. 1, at 7.)

The Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

. . . Smith argues that the prosecutor committed misconduct during closing rebuttal argument by commenting on his right not to testify. Specifically, Smith points to the following comments: "[Smith] can't explain away why he has his cell phone—her cell phone because it doesn't make sense that he would have it in some sort of trade." Because Smith did not object to the challenged argument, we review for plain error affecting his substantial rights. *Mclellan*, 124 Nev. at 267, 182 P.3d at 109.

Prosecutorial comment on a defendant's failure to testify is constitutionally impermissible. *Sonner v. State*, 112 Nev. 1328, 1342, 930 P.2d 707, 716 (1996); *McGuire v. State*, 100 Nev. 153, 157, 677 P.2d 1060, 1063 (1984). An indirect reference is impermissible where "'the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be comment on the defendant's failure to testify.'" *Harkness v. State*, 107 Nev. 800, 803, 820 P.2d 759, 761 (1991) (quoting *United States v. Lyon*, 397 F.2d 505, 509 (7th Cir.1968)). Considering it in context, the prosecutor's comment was made in response to Smith's argument that because it was unknown how the cell phone came to be in

-13-

1  Smith's home, the State failed to meet its burden of proof. Under
2  the circumstances, we do not consider the challenged comment
   improper. *See Bridges v. State*, 116 Nev. 752, 764, 6 P.3d 1000,
3  1009 (2000) (observing that "where 'the prosecutor's reference to
   the defendant's opportunity to testify is a fair response to a claim
4  made by defendant or his counsel,' there is no constitutional
   violation" (quoting *United States v. Robinson*, 485 U.S. 25, 32
5  (1988))). Even assuming that the comment was improper, we
   conclude that Smith has failed to show plain error affecting his
6  substantial rights, considering the brevity of the comment and the
   evidence supporting his guilt.

7  (ECF No. 12-19, at 5-6; Exhibit 38, at 4-5.)

8  The state supreme court's determination in the first instance that the challenged

9  statement was not improper was neither contrary to nor an unreasonable application of

10 governing Supreme Court precedent. *See, e.g., United States v. Robinson*, 485 U.S. 25, 32-

11 34 (1988) (prosecutorial argument must be examined in context, and it is important that both

12 the defense and the prosecution have the opportunity to fairly meet the evidence and

13 arguments of one another). The prosecutor clearly was arguing that the defense could not

14 "explain away" the presence of the cell phone at the residence based upon a supposed trade

15 for drugs because it made no sense that the addicted Applewhite would trade the phone for

16 drugs and then have her new drug contact charged with robbery. The prosecutor made no

17 suggestion that Smith had failed to take the stand to explain the presence of the phone.

18 Rather, the prosecutor plainly argued that the defense supposition that Applewhite traded the

19 phone for drugs "can't explain away why he has . . . her cell phone because it doesn't make

20 sense that he would have it in some sort of trade." Arguing that a defense closing argument

21 "doesn't make sense" does not constitute a comment on the defendant's failure to testify.

22 Petitioner cites no apposite Supreme Court authority establishing that such a prosecution

23 rebuttal argument responding to a defense closing argument constitutes a constitutionally

24 impermissible comment upon a defendant's failure to testify.[7]

25 Ground B therefore does not provide a basis for federal habeas relief.

26

27 _____

28 [7]Petitioner's parallel claim under the Nevada state constitution fails to present a cognizable claim for federal habeas relief.

-14-

***Ground C: Contact With Juror***

In Ground C, petitioner alleges that the trial court erred by failing to remove a juror after one of Smith's family members questioned the juror about the jury selection process and the absence of a black person on the jury. Smith alleges that the trial court erred in its action, but he does not expressly specify a federal constitutional basis for the claim. (ECF No. 1, at 7-8.)

The state supreme court summarized the relevant background and held as follows with regard to the claim presented to that court:

> . . . Smith argues that the district court erred by not dismissing a juror based on the juror's contact with a third party. During trial, juror 10 notified the district court that Smith's sister approached him and asked if he knew anything "about the jury selection process and shouldn't there be a black person on the jury." The juror indicated that the encounter would not affect his ability to continue his duties. The remaining jurors were canvassed about any attempted contact with them or if they observed anyone attempting to contact a juror. One juror responded that she observed someone talking to a juror but did not hear the conversation. At the conclusion of the inquiry, the district court determined that removing juror 10 was "probably not necessary" but would accommodate the parties if they agreed to juror 10's dismissal. After consulting with counsel, Smith declined to seek removal of the juror. Considering Smith's decision not to challenge juror 10 and the lack of any indication that the contact prejudiced him, *see Meyer v. State*, 119 Nev. 554, 563–64, 80 P.3d 447, 455 (2003), we conclude that the district court did not abuse its discretion in this regard, see *Weber v. State*, 121 Nev. 554, 580, 119 P.3d 107, 125 (2005).

(ECF No. 12-19, at 7-8; Exhibit 38, at 6-7.)

The state supreme court's summary accurately reflects the underlying record. (ECF No. 10-13, at 91-119; Exhibit 13, at 90-118.) Smith personally declined on the record to seek the removal of the juror, as well as through counsel. (*Id.*, at 117; Exhibit 13, at 116.)

Petitioner does not specify an exhausted federal constitutional basis for this claim, much less cite apposite Supreme Court precedent requiring exclusion of the juror even after Smith expressly declined the opportunity to seek his removal. The sole federal decision cited by petitioner, *Fahy v. Connecticut*, 375 U.S. 85 (1963), does not involve contact with jurors; and the cited *Meyer* Nevada state court decision does not apply federal constitutional law to the claim. Contact with a juror of course potentially might implicate federal constitutional

1  guarantees of an impartial jury, due process, and a fair trial.  However, petitioner in essence

2  seeks to have this Court conduct a *de novo* review of the state supreme court's rejection of

3  a claim that the trial court abused its discretion in declining to exclude the juror *sua sponte*

4  under Nevada state law criteria.  Particularly given the paucity of controlling Supreme Court

5  precedent establishing what constitutes constitutionally cognizable juror bias,[8] petitioner has

6  failed to establish that any implicit rejection of an exhausted federal constitutional claim by the

7  state supreme court was either contrary to or an unreasonable application of clearly

8  established federal law as determined by the United States Supreme Court.  In the final

9  analysis, it is the petitioner's burden to establish that he is entitled to habeas relief.

10  *Pinholster*, *supra*.

11       Ground C therefore does not provide a basis for relief.[9]

12  **Ground D: References to Prior Criminality**

13       In Ground D, petitioner alleges that the trial court abused its discretion by allowing

14  publication of an exhibit that referenced the pending charge for ex-felon in possession of a

15  firearm.  He alleges that this error was compounded by the State's use of a photograph in its

16  opening statement that showed his "Scope" identification number and a prior arrest date.[10]

17  Smith alleges that the trial court erred, citing to Nevada state case law; but he does not

18  expressly specify a federal constitutional basis for the claim.  (ECF No. 1, at 8-9.)

19       / / / /

20

21       [8]*See, e.g., Williams v. Johnson*, 840 F.3d 1006, 1010 (2016), *cert. denied*, 137 S.Ct. 1344 (2017)(in
the context of a defense challenge to the trial court's exclusion of a juror due to alleged bias).  Supreme Court

22  precedent does establish that the remedy – when a claim of juror partiality is raised – "is a hearing in which
the defendant has the opportunity to prove actual bias."  *Smith v. Phillips*, 455 U.S. 209, 215-16 (1982).  The

23  state district court conducted a full and prompt inquiry into the juror contact issue in this case.

24       [9]The Court further would reject a federal constitutional claim, if actually presented herein, on a *de
novo* review on the underlying facts reflected in the state court record.  *Inter alia*, the time for petitioner to

25  seek the exclusion of the juror was at trial; and he declined to do so after the state district court's full inquiry
into the matter with each juror individually.

26

27       [10]Scope is a computerized system used by the Las Vegas police department that includes criminal
histories but also is used for other purposes such as work cards issued by the sheriff.  While the court and

28  counsel were aware of what the number and date represented, the state court record reflects that only a
number and a date were on the photograph.  (ECF No. 10-13, at 3-8; Exhibit 13, at 2-7.)

1    The state supreme court summarized the relevant background and held as follows with

2    regard to the claim presented to that court:

3
                . . . Smith contends that the district court abused its
4          discretion by admitting an exhibit referencing the bifurcated
           felon-in-possession charge during the trial on the remaining
5          charges. Smith brought to the district court's attention that the
           State had introduced an exhibit indicating that the police had
6          impounded a cell phone related to the case. The exhibit lists the
           charges against him, including the entry "Ex–Felon Poss. of F/A."
7          It appears from the record that the jury was exposed to the exhibit
           for only a few seconds. After some discussion, the district court
8          designated the exhibit as a court exhibit so that it would not be
           given to the jury during its deliberations. Smith requested no
9          additional remedy. Although error was committed in this instance,
           *see generally Morales v. State*, 122 Nev. 966, 970, 143 P.3d 463,
10         465–66 (2006) ("As with full severance, bifurcation prevents the
           State from discussing or producing proof of prior felony
11         convictions until after the jury has deliberated on the charges that
           are unrelated to the defendant's status as an ex-felon."), given the
12         jury's brief exposure to the exhibit, we conclude that Smith failed
           to show prejudice.[FN2]
13
                [FN2] Smith argues that this error was compounded
14              by the State's use of a photograph during opening
                statement that contained his "Scope ID" and date of
15              arrest. It appears from the record that the jury's
                exposure to the photograph was brief and the
16              parties agreed to redact the challenged information
                if the photograph was admitted into evidence or
17              otherwise used at trial. Under those circumstances,
                even if error was committed, Smith has not shown
18              prejudice.

19   (ECF No. 12-19, at 6-7; Exhibit 38, at 5-6.)

20         The state supreme court's summary accurately reflects the underlying record. (ECF

21   No. 10-13, at 3-8; Exhibit 13, at 2-7. ECF No. 11-4, at 3-5; Exhibit 17, at 2-4.) Smith, after

22   consulting with and through counsel, specifically eschewed seeking a mistrial on either basis.

23   (ECF No. 10-13, at 3; Exhibit 13, at 2. ECF No. 11-4, at 3; Exhibit 17, at 2.)

24         As with prior claims, Ground D as alleged in federal court presents a state law claim

25   of error that is not cognizable on federal habeas review. Smith argues at length that the trial

26   court erred under Nevada state cases applying primarily Nevada state law. Such a claim of

27   error under Nevada state law is not cognizable in a federal habeas proceeding. *See, e.g.,*

28   *Estelle v. McGuire, supra.*

1    To the further extent that Smith alleges that the brief display of the two items in

2  question violated an unspecified federal constitutional guarantee as to an exhausted federal

3  claim, the state supreme court's implicit rejection of the claim was neither contrary to nor an

4  unreasonable application of clearly established federal law as determined by the United

5  States Supreme Court.  Petitioner cites no governing Supreme Court case law requiring

6  reversal on this basis.  *Cf. Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006)(the

7  Supreme Court has expressly left open the question of whether introduction of propensity

8  evidence can violate due process).  Petitioner, again, has the burden of establishing his

9  entitlement to federal habeas relief.  *Pinholster, supra*.  Reliance upon a purely state law

10 argument under state case law fails to carry that burden.

11    Ground D therefore does not provide a basis for federal habeas relief.[11]

12 ***Ground E: Hearsay***

13    In Ground E, petitioner alleges that the complaining witness' testimony contained

14 inadmissible hearsay that improperly bolstered her story.  He claims that Melissa Applewhite

15 was improperly allowed to testify that, on her way to the drug buy that turned into a robbery,

16 a friend said to her during a cell phone call to not go because she should not be meeting

17 people that she did not know for pills.  He maintains that the testimony was inadmissible

18 hearsay under N.R.S. 51.035.  (ECF No. 1, at 9-10.)

19    The state supreme court summarized the relevant background and held as follows:

20          . . .  Smith argues that the district court abused its
      discretion by allowing the prosecution to introduce inadmissible
21      hearsay. During her testimony, the victim related that immediately
      before the robbery, she called a friend who advised her that she
22      should not meet with people she did not know to buy pills.
      Considering the context in which the statement was made, we
23      conclude that it was unsolicited by the State and not offered to
      prove the truth of the matter asserted and therefore did not
24      constitute hearsay. See NRS 51.035.

25 (ECF No. 12-19, at 5; Exhibit 38, at 4.)

26

27  _____

28    [11]The Court would reach the same result also on a *de novo* review, particularly given Smith's failure
   to seek any additional relief in the state trial court.

-18-

The state supreme court's summary is fully supported by the underlying record.  The

witness volunteered the testimony of which Smith complains during the following exchange:

> Q    Okay.  *And I don't want you to talk about what was said,*
> but you had a conversation with her and then ultimately,
> did you go over to meet up to get these pills?
>
> A    Yes, I did.  She told me don't go because I don't know
> what I'm doing, and I shouldn't be meeting people that I
> don't know for pills.
>
> Q    Okay.  But you *went* –
>
> A    And she was right.  I shouldn't have met people I don't
> know for pills.
>
> Q    Well, and *let me stop you there*.
>
> MR HOO: And Judge, I think it's –
>
> BY MS. SCHIFALACQUA:
>
> Q    *Let me stop you there*.  *I don't want you to get into what*
> *somebody else said* . . . .

(ECF No. 10-13, at 27-28; Exhibit 13, at 26-27.)(Emphasis added.)

As with prior claims, Ground E as alleged in federal court presents a state law claim

of error that is not cognizable on federal habeas review.  Smith argues that the trial court

erred under Nevada statutory law and Nevada state cases applying exclusively Nevada state

law.  Such a claim of error under Nevada state law is not cognizable in a federal habeas

proceeding.  *See, e.g., Estelle v. McGuire, supra*.

To the further extent that Smith alleges that the unsolicited hearsay violated an

unspecified federal constitutional guarantee as to an exhausted federal claim, the state

supreme court's implicit rejection of the claim was neither contrary to nor an unreasonable

application of clearly established federal law as determined by the United States Supreme

Court.  Petitioner cites no governing Supreme Court case law requiring reversal on this basis.

Petitioner has the burden of establishing his entitlement to federal habeas relief,  *Pinholster,*

*supra*; and reliance upon a purely state law argument fails to carry that burden under AEDPA.

This Court further would not grant relief on this claim even on a *de novo* review.

Nothing in this unsolicited testimony upon a collateral – in truth, wholly irrelevant – point

deprived petitioner of due process of law, a fundamentally fair trial, or any more specific right

guaranteed under the Constitution.

Ground E therefore does not provide a basis for federal habeas relief.

### Ground F: Bolstering of Complaining Witness' Testimony

In Ground F, petitioner alleges that the trial court committed plain error in allowing

police officers to improperly bolster the complaining witness' testimony and vouch for her

credibility. (ECF No. 1, at 10-11.)

The state supreme court summarized the relevant background and held as follows:

> . . . Smith argues that the district court abused its
> discretion by allowing a police officer to improperly bolster the
> victim's credibility. In her initial statements to the police, the victim
> related that at the time of the robbery, she was on her way to
> meet a friend and pulled into the liquor store because someone
> was following her. When police officers confronted her with
> evidence that refuted her initial statements, the victim told the
> police that she was in the area to buy prescription pain pills. A
> detective testified at trial about that confrontation, stating that the
> victim gave the police "the correct [version]—well, a different
> version, let's put it that way." When asked by the prosecutor
> whether the victim was "able to basically, come clean about the
> circumstances of the background of coming in contact with the
> defendant," the detective responded affirmatively. Smith argues
> that that exchange constituted improper bolstering. Because he
> did not object to the detective's testimony, we review for plain
> error affecting his substantial rights. *Mclellan*, 124 Nev. at 267,
> 182 P.3d at 109. We conclude that Smith has failed to
> demonstrate plain error affecting his substantial rights. The
> challenged testimony does not concern crucial evidence about
> the robbery but rather a lesser matter—why the victim was in the
> area of the crime. Moreover, the detective's testimony shows that
> the victim lied to the police, which tended to diminish her
> credibility rather than bolster it. And the victim admitted during her
> testimony that she lied to the police.

(ECF No. 12-19, at 5; Exhibit 38, at 4.)

The state supreme court's summary is fully supported by the underlying record. (ECF

No. 11-2, at 101-05 & 120-24; Exhibit 15, at 100-04 & 119-23. ECF No. 11-4, at 98-100 &

124-45; Exhibit 17, at 97-99 & 123-44.) Detective Abell in particular very clearly articulated

the distinction that Applewhite gave "well, a different version, let's put it that way" after

detectives confronted her about her account three days after the incident. (ECF No. 11-2, at

102; Exhibit 15, at 101.)

As with prior claims, Ground F as alleged in federal court in large part presents a state law claim of error that is not cognizable on federal habeas review. Smith argues that the trial court erred under Nevada state cases applying primarily Nevada state law. Such a claim of error under Nevada state law is not cognizable in a federal habeas proceeding. *See, e.g., Estelle v. McGuire, supra*.

To the further extent that Smith alleges that the detectives' testimony violated an unspecified federal constitutional guarantee as to an exhausted federal claim, the state supreme court's implicit rejection of the claim, in reviewing for plain error affecting substantial rights, was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Petitioner cites no governing Supreme Court case law requiring reversal on this basis. Petitioner has the burden of establishing his entitlement to federal habeas relief, *Pinholster, supra*; and reliance upon a purely state law argument fails to carry that burden under AEDPA.

This Court further would not grant relief on this claim even on a *de novo* review. Nothing in the detectives' testimony in this regard deprived petitioner of due process of law, a fundamentally fair trial, or any more specific right guaranteed under the Constitution.

Ground F therefore does not provide a basis for federal habeas relief.

### Ground G:  Effective Assistance of Counsel

In Ground G, petitioner alleges that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments because trial counsel: (1) failed to file a motion at his request: (a)  to suppress all of the evidence on the basis that there was no evidence that a second person was involved; and (b) to dismiss the charge for ex-felon in possession of a firearm because no weapon was recovered during the search of his home and vehicle; (2) "refused to object to anything during trial;" (3) "failed to object to the amended charges;" and (4) "failed to fully investigate, which resulted in petitioner not receiving the best defense possible."

The Supreme Court of Nevada expressly addressed four ineffective-assistance claims, including the following claim:

> . . . [A]ppellant claimed that his trial counsel was ineffective for failing to file a motion to suppress "all" of the evidence because there was no evidence of a second person for the conspiracy charge and no weapon was found for the felon-in-possession-of-a-firearm charge. Appellant failed to demonstrate that his counsel's performance was deficient or that he was prejudiced. Appellant failed to demonstrate that such a motion would have been meritorious. Further, he failed to identify what evidence should have been suppressed. Appellant failed to demonstrate that there was a reasonable probability of a different outcome had trial counsel litigated a motion to suppress. Therefore, we conclude that the district court did not err in denying this claim.

(ECF No. 12-29, at 4; Exhibit 48, at 3.)

The state supreme court's express rejection of the foregoing claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

On petitioner's claims of ineffective assistance of counsel, he must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). On the performance prong in particular, "[e]ven under a *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. Accordingly,

> . . . *Strickland* specifically commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U.S., at 689–690, 104 S.Ct. 2052. The [reviewing

-22-

court is] required not simply to "give [the] attorneys the benefit of the doubt," . . . but to affirmatively entertain the range of possible "reasons [defense] counsel may have had for proceeding as they did," . . . (Kozinski, C.J., dissenting). *See also Richter, supra*, at 1427, 131 S.Ct., at 791 ("*Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

*Pinholster*, 563 U.S. at 196. *See also Richter*, 562 U.S. at 109-10.

When the deferential review of counsel's representation under *Strickland* is coupled with the deferential standard of review of a state court decision under AEDPA, *Richter* instructs that such review is "doubly" deferential:

> . . . . The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

In the present case, there certainly is a reasonable argument that counsel satisfied *Strickland*'s deferential standard when he declined to file the motion requested by Smith. Petitioner's claim is based upon fallacious assumptions that he could not be convicted of conspiracy to commit robbery and robbery unless his accomplice was arrested and that he could not be convicted of the charge of ex-felon in possession of a weapon unless the weapon that he used in the robbery was recovered. There was ample admissible evidence from which a jury could infer that Smith coordinated his actions leading up to and during the robbery with an accomplice.[12] There further was ample admissible evidence from which a trier of fact could infer that Smith possessed a weapon, including, in particular, the victim's testimony that he placed a semiautomatic pistol to her neck during the robbery and said, *inter alia*, "Imma shoot this bitch."[13] Smith's mistaken assumptions that he could not be convicted of the conspiracy, robbery, and weapon possession charges, and that the evidence must be

---

[12]See text, *supra*, at 2-3 & 5-6.

[13]See *id.*, at 3 & 4.

suppressed, without the arrest of his accomplice and recovery of the pistol are based upon nothing more than frivolous jailhouse logic.

The state supreme court's express rejection of this claim indisputably was neither contrary to nor an unreasonable application of *Strickland*.

The state supreme court's implicit rejection of Smith's remaining bare and conclusory claims further was neither contrary to nor an unreasonable application of *Strickland* on the record and arguments presented to the state courts. Bare claims only that counsel "refused to object to anything during trial," "failed to object to the amended charges;" and "failed to fully investigate" that are unsupported by any factual specifics do not present viable claims on either state or federal post-conviction review. *See, e.g., James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

This Court further would deny all of the ineffective-assistance claims presented even on a *de novo* review. Review of the trial record reflects that defense counsel pursued a reasonable trial strategy of challenging the credibility of the complaining witness, pointing to the absence of corroborating evidence specifically at the time of the robbery, and positing an alternative scenario as a basis for doubt in which Smith may have obtained the victim's cell phone in trade for the painkillers that she sought.[14] Petitioner's conclusory allegations do not overcome *Strickland*'s strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment.

Ground G therefore does not provide a basis for federal habeas relief.[15]

IT THEREFORE IS ORDERED that the petition for a writ of habeas corpus is DENIED on the merits and that this action shall be DISMISSED with prejudice.

---

[14]See, e.g., ECF No. 11-6, at 27- 43; Exhibit 19, at 26-42 (defense closing argument).

[15]To the extent that petitioner presents an exhausted constitutional claim of cumulative error in the final paragraphs of the federal petition (ECF No. 1, at 12-13), the state supreme court's rejection of the cumulative error claim presented to that court on direct appeal was neither contrary to nor an unreasonable application of clearly established federal law. (ECF No 12-19, at 8 n.3; Exhibit 38, at 7 n.3. ) Moreover, the Court would not be persuaded on a *de novo* review that petitioner presents a viable claim of cumulative error, given that his individual claims, including his ineffective-assistance claims, are bereft of merit.

-24-

1   IT FURTHER IS ORDERED that a certificate of appealability is DENIED, as jurists of

2   reason would not find the Court's disposition of the claims presented to be debatable or

3   wrong.  Ground A is based in the main upon meritless assumptions that (a) the complaining

4   witness' testimony had to be excluded because she was a drug user who initially lied to the

5   police, and (b) petitioner could not be convicted unless his robbery accomplice also was

6   arrested and the gun was recovered.[16]  The state supreme court's rejection of the claim in

7   Ground B that the State improperly commented on petitioner's failure to testify was neither

8   contrary to nor an unreasonable application of clearly established federal law.[17]  Grounds C,

9   D, E and F in the main present state law claims that are not cognizable on federal habeas

10  review.[18]  The principal ineffective-assistance claim in Ground G also is based upon the

11  meritless assumption that petitioner could not be convicted unless his robbery accomplice

12  was arrested and the gun was recovered, and the remaining ineffective-assistance claims

13  therein are wholly conclusory claims unsupported by specific facts.[19]  The issues presented

14  clearly are not "adequate to deserve encouragement to proceed further" under the governing

15  standards in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

16  IT FURTHER IS ORDERED that petitioner's motion (ECF No. 49) for judicial action is

17  DENIED as moot, particularly as respondents already have answered the petition.

18  The Clerk of Court shall enter final judgment accordingly, in favor of respondents and

19  against petitioner, dismissing this action with prejudice.

20  DATED: March 21, 2018

21

22  _____

23  Gloria M. Navarro
    Chief United States District Judge

24

25  [16]See text, *supra*, at 8-11.  The trial evidence is summarized at 2-6.

26  [17]See *id.*, at 12-14.

27  [18]See *id.*, at 15-21.

28  [19]See *id.*, at 21-24.

-25-